ORIGINAL

1  Susan G. Kupfer (Bar No. 141724)
   Kathleen S. Rogers (Bar No. 122853)
2  GLANCY BINKOW & GOLDBERG LLP
   One Embarcadero Center, Suite 760
3  San Francisco, CA 94111
   Telephone: (415) 972-8160        E-filing
4  Facsimile:   (415) 972-8166
   skupfer@glancylaw.com
5

6                    UNITED STATES DISTRICT COURT

7                  NORTHERN DISTRICT OF CALIFORNIA

8

9                                              CV. 08          1458
   RUFUS BROWNING, on behalf of himself and    Case No.:
10 all others similarly situated,
                                              **CLASS ACTION COMPLAINT FOR**
11            Plaintiff,                       **DAMAGES**

                                                                        MEJ
12            vs.                             **JURY TRIAL DEMANDED**

13 AIR NEW ZEALAND, LTD.; ALL NIPPON
   AIRWAYS CO., LTD.; CATHAY PACIFIC
14 AIRWAYS, LTD.; CHINA AIRLINES, LTD.;
   EVA AIRWAYS CORPORATION; JAPAN
15 AIRLINES CORPORATION; QANTAS
   AIRWAYS, LTD.; SINGAPORE AIRLINES,
16 LTD.; and THAI AIRWAYS
   INTERNATIONAL PUBLIC COMPANY,
17 LTD.,
             Defendants.
18

19

20

21

22

23

24

25

1

**INTRODUCTION**

2      1.      Plaintiff Rufus Browning brings this action on behalf of himself individually and

3   on behalf of a plaintiff class of all persons and entities who purchased air passenger

4   transportation services for transpacific flights to or from the United States (other than between

5   the United States and Korea) from one of the named defendants between January 1, 2004 and the

6   present (the "Class Period"), (the "Class").

7      2.      Defendants are among the largest airlines in the world, each flying millions of

8   passengers a year. Defendants service many of the same transpacific routes and are competitors

9   of each other. Plaintiff alleges that during the Class Period, defendants conspired, combined and

10   contracted to fix, raise, maintain, and stabilize the prices at which they sold air passenger

11   transportation services, including base fares and/or fuel surcharges, for transpacific flights to or

12   from the United States other than between the United States and Korea ("Transpacific Air

13   Services").

14      3.      As a result of the defendants' unlawful conduct, plaintiff and the other members

15   of the Class paid artificially inflated prices for such Transpacific Air Services. The prices they

16   paid exceeded the amount they would have paid in a competitive market.

17

**JURISDICTION AND VENUE**

18      4.      Plaintiff brings this action under Sections 4, 12 and 16 of the Clayton Act (15

19   U.S.C. §§15, 22 and 26) for treble damages and injunctive relief, arising from violations by

20   defendants of the antitrust laws, including Section 1 of the Sherman Antitrust Act (15 U.S.C. §1).

21      5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and

22   1337(a).

23      6.      Venue is proper in this judicial district pursuant to 15 U.S.C. §§15, 22 and 26, and

24   28 U.S.C. §§1391(b), (c) and (d) in that defendants reside, transact business, are found and/or

25   have agents within this judicial district, and a substantial part of the events giving rise to

CLASS ACTION COMPLAINT

- 2 -

1  plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce
2  described below has been carried out in this district.

3      7.     This Court has personal jurisdiction over defendants because each (1) transacted
4  business in this district; (b) directly or indirectly sold and delivered Transpacific Air Services in
5  this district; (c) has substantial aggregate contacts with this district; and (d) engaged in an illegal
6  price-fixing conspiracy that was directed at, and had the intended effect of causing injury to,
7  persons and entities residing in, located in, or doing business in this district.

8  ## INTRADISTRICT ASSIGNMENT

9      8.     As indicated on the Civil Cover Sheet accompanying this complaint, related
10  multi-district litigation ("MDL") is pending in this Court before the Honorable Charles R.
11  Breyer, M:08-cv-1913-CRB, *In re Transpacific Air Passenger Transportation Antitrust*
12  *Litigation.* The defendants, the industry, the geography and the basic allegations of the
13  conspiracy alleged in this complaint substantially overlap the allegations in the complaints
14  already consolidated before the Honorable Charles R. Breyer in M:08-cv-1913-CRB. This
15  complaint expressly does not include allegations regarding flights between the United States and
16  Korea, or allegations against Korean Air Lines Co., Ltd. ("Korean Air") and Asiana Airlines,
17  Inc., ("Asiana") which are the subject of a separate MDL proceeding pending in the Central
18  District of California before the Honorable James S. Otero, MDL No. 1891 (Master File No. CV
19  07-05107 SJO (AGRx), *In re Korean Air Lines Co., Ltd. Antitrust Litigation.*

20  ## PARTIES

21  **A.    Plaintiff**

22      9.     Plaintiff Rufus Browning is a resident of Alameda County, California. During the
23  Class Period, plaintiff purchased Transpacific Air Services from one or more of the defendants.
24
25

**B.     Defendants**

10.     Defendant Air New Zealand, Ltd. ("Air New Zealand") is a New Zealand company headquartered at Level 19, Quay Tower, 29 Customs St. West, Auckland, 1020, New Zealand. Air New Zealand is considered the South Pacific's largest international carrier with a focus on Australia and the South Pacific. The airline provides service within New Zealand, as well as to and from Australia, the South Pacific, Asia, North America and the United Kingdom. It has hubs in Auckland and Los Angeles. During the Class Period, Air New Zealand sold Transpacific Air Services.

11.     Defendant All Nippon Airways Co., Ltd. ("ANA") is a Japanese company headquartered at Shiodome-City Center, 1-5-2, Higashi-Shimbashi, Minator-Ku, Tokyo 105-7133, Japan. ANA is Japan's second largest domestic and international airline after Japan Airlines Corporation, operating 49 domestic and 22 international routes. During the Class Period, ANA sold Transpacific Air Services.

12.     Defendant Cathay Pacific Airways, Ltd. ("Cathay Pacific") is a Hong Kong-based company with its principal place of business at Cathay Pacific City, 8 Scenic Road, Hong Kong International Airport, Lantau, Hong Kong. Cathay Pacific serves 111 destinations in 35 countries and territories. Cathay Pacific reported in a December 13, 2007 press release on its website that Cathay Pacific and its subsidiary Dragonair combined carried over 2 million passengers during the month of November 2007. During the Class Period, Cathay Pacific sold Transpacific Air Services.

13.     Defendant China Airlines, Ltd. ("China Air") is a Taiwanese company headquartered at 131, Sec. 3, Nanking E. Rd., Taipei, Taiwan. China Air was the first Asian carrier to fly the transpacific route between Taiwan and the United States. It services 68 cities in 25 countries. During the Class Period, China Air sold Transpacific Air Services.

- 4 -

1    14.    Defendant EVA Airways Corporation ("EVA Air") is a Taiwanese company

2  headquartered at 117, Sec.2, Chang-An E. Rd., Taipei, 104, Taiwan.  EVA Air is the largest

3  privately-owned Taiwanese airline.  It operates passenger service to international destinations in

4  Asia, Australia, New Zealand, Europe and North America.  During the Class Period, EVA Air

5  sold Transpacific Air Services.

6    15.    Defendant Japan Airlines Corporation ("JAL") is a Japanese company

7  headquartered at 4-11 Higashi-shinagawa 2 chome, Shinagawa-Ku, Tokyo 140-8638, Japan.

8  JAL is one of the largest air carriers in the world and the largest airline operator in Asia.  During

9  the Class Period, JAL sold Transpacific Air Services.

10    16.    Defendant Qantas Airways Ltd. ("Qantas") is an Australian company

11  headquartered at 203 Coward Street, Mascot NSW 2020, Australia.  Qantas is the largest

12  domestic and international carrier in Australia.  During the Class Period, Qantas sold

13  Transpacific Air Services.

14    17.    Defendant Singapore Airlines, Ltd. ("Singapore Air") is a Singapore company

15  headquartered at Airline House, 25 Airline Road, Singapore 819829.  Singapore Air is one of

16  Asia's leading airlines.  During the Class Period, Singapore Air sold Transpacific Air Services.

17    18.    Defendant Thai Airways International Public Company, Ltd. ("Thai Air") is a

18  Thai company headquartered at 89 Vibhavadi Rangsit Road, Bangkok 10900, Thailand.  Thai

19  Air flies to 74 destinations in 34 countries on four continents.  During the Class Period, Thai Air

20  sold Transpacific Air Services.

21  **C.    Agents and Co-Conspirators**

22    19.    The acts alleged against the defendants in this complaint were authorized,

23  ordered, or done by their officers, agents, employees, or representatives, while actively engaged

24  in the management and operation of defendants' businesses or affairs.

25

1    20.    Certain other persons, firms, corporations and entities have participated as

2    unnamed co-conspirators in the violations and conspiracy alleged. In order to engage in the

3    offenses charged and violations alleged, these co-conspirators have performed acts and made

4    statements in furtherance of the antitrust violations and conspiracies alleged.

5    21.    At all relevant times, each defendant was an agent of each of the remaining

6    defendants, and in doing the acts alleged, was acting within the course and scope of such agency.

7    Each defendant ratified and/or authorized the wrongful acts of each of the defendants.

8    Defendants, and each of them, are individually sued as participants and as aiders and abettors in

9    the improper acts and transactions that are the subject of this action.

10    **TRADE AND COMMERCE**

11    22.    Throughout the Class Period, defendants transported substantial numbers of

12    passengers, in a continuous and uninterrupted flow of interstate and foreign trade and commerce,

13    between various airports in the United States and foreign airports.

14    23.    Throughout the Class Period, there was a continuous and uninterrupted flow of

15    invoices for payment, payments, and other documents essential to the provision of Transpacific

16    Air Services transmitted in interstate and foreign trade and commerce between and among

17    offices of defendants and their customers located throughout the world, including throughout the

18    United States.

19    24.    Throughout the Class Period, defendants' unlawful activities, as described in this

20    complaint, took place within, and substantially affected, the flow of interstate and foreign trade

21    and commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in

22    the United States and elsewhere.

23

24

25

- 6 -

CLASS ACTION COMPLAINT

1

## FACTUAL ALLEGATIONS

2

**A.    The Industry**

3      25.    Defendants are large, international passenger air carriers. Each defendant

4   provides passenger air transportation services on transpacific routes to and from the United

5   States.

6      26.    Some of the defendants operate jointly through marketing alliances and code

7   sharing agreements. For example, Singapore Air owns 25 percent of Air New Zealand.

8   Defendants Air New Zealand, ANA, Singapore Air, Thai Air and JAL are members of one of the

9   most visible marketing alliances; the Star Alliance. Air New Zealand has code share agreements

10   with Qantas and Singapore Air. Singapore Air also is a code share partner of ANA, and JAL is a

11   code share partner of Thai Air. Cathay Pacific has codeshare agreements with JAL and Qantas.

12      27.    These types of operating agreements create the potential for anticompetitive

13   conduct, according to testimony by the Department of Justice's ("DOJ") Antitrust Division

14   before the Senate Committee on Commerce, Science and Transportation:

15              [A]irline marketing alliances...are essentially joint ventures between airlines.
                These alliances fall somewhere between an outright merger and a traditional
16              arm's-length interline agreement. Marketing alliances come in all shapes and
                sizes... Alliances involving code-sharing are in many respects the most
17              controversial. They have the potential to be pro-competitive- they can create new
                service, improve existing service, lower costs, and increase efficiency, all to the
18              benefit of the traveling public. Code sharing agreements also have the potential to
                be anticompetitive. They can result in market allocation, capacity limitations,
19              higher fares, or foreclosure of rivals from markets, all to the injury of the
                consumers... the greatest threat to competition comes when two of very few
20              airlines that compete in a market enter into a code-sharing agreement in that
21              market.

22      28.    In addition to their marketing relationships, the defendants in this case also have

23   close dealings through their participation in trade organizations. The defendants all are

24   members of the International Air Transport Association ("IATA"). IATA is an international

25   trade body representing over 240 airlines and has served as a forum for its members to discuss

1  rising fuel costs and the need for measures to mitigate such costs, such as increasing fares or
2  levying fuel surcharges.

3      29.    In addition to their general memberships in the IATA, Singapore Air's Chief
4  Executive Officer, Chew Choon Seng, Qantas' President, Geoff Dixon, Cathay Pacific's Chief
5  Executive Officer, Tony Tyler and JAL's President, Toshiyuki Shinmachi, all serve on IATA's
6  Board.

7      30.    Each defendant also is a member of the Association of Asia Pacific Airlines
8  ("AAPA"). AAPA is a regional trade association representing 17 major airlines based in Asia
9  Pacific. Like IATA, AAPA has served as a forum for its members to discuss rising fuel costs
10 and the need for measures to mitigate such costs, such as increasing fares or levying fuel
11 surcharges.

12 **B.    The Conspiracy**

13     31.    Between 1992 and 2002, profits from air passenger tickets, measured by revenue
14 per passenger mile, declined by over 30% mainly due to increasingly intense price competition.

15     32.    Since 2002, substantial fuel cost increases have put additional pressure on
16 passenger yields and airlines' profitability. After peaking in 2000, fuel prices declined for about
17 two years. In 2002, however, fuel costs began a period of exponential increases. Between 2004
18 and 2005, for example, fuel costs increased 43%. Between 2005 and 2006 fuel costs increased
19 50%.

20     33.    Airlines spend about 10% to 20% of their operating costs on fuel. The impact of
21 rising fuel costs on individual airlines' profits varies widely, depending on criteria such as fleet
22 utilization and efficiency. The impact of rising fuel also varies depending on how much of
23 projected fuel consumption was committed to at a fixed price at the beginning of the year, a
24 practice known as hedging. For example, in 2004 and 2005, Singapore Air hedged about 33% of
25

CLASS ACTION COMPLAINT

1    its fuel needs at $32[1] per barrel. Some carriers, such as China Air, on the other hand, are not

2    allowed to hedge fuel costs, making them more susceptible to swings in the market.

3        34.    In late 2003, some airlines began imposing fuel surcharges, purportedly to cover

4    rising fuel costs. Previously, cost recovery was built into the base fare for a ticket.

5        35.    Beginning on or about January 1, 2004, notwithstanding the varying effects of

6    rising fuel costs on each defendant, defendants began imposing increases that were lockstep in

7    their timing and amount. The close timing and amount of defendants' fuel surcharge increases

8    were not coincidences, but rather the product of a collusive agreement to fix, raise, maintain and

9    stabilize prices for Transpacific Air Services.

10        36.    For example, on May 11, 2004, Qantas announced fuel surcharges between $4

11    and $10 for tickets effective May 13, 2004. The following day, May 12, 2004, Air New Zealand

12    announced a fuel surcharge of $12.2 per sector on long-haul international services, effective May

13    17, 2004. That same day, Cathay Pacific announced that it was considering a fuel surcharge on

14    ticket prices because of surging oil prices. On June 7, 2004, China Air began collecting a $7 fuel

15    surcharge.

16        37.    On August 16, 2004, Cathay Pacific announced a fuel surcharge of $19 per

17    passenger for long-haul flights to cover the cost of rising jet fuel prices until November 30, 2004.

18    On August 19, 2004, Singapore Air announced fuel surcharges on tickets for all flights effective

19    September 1, 2004. The surcharge increases ranged from $4 to $12. On August 20, 2004,

20    Qantas announced that it would increase its fuel surcharges on international passenger fares to

21    $16. On August 26, 2004, Air New Zealand announced a new fuel surcharge increase of $6 per

22    sector on long-haul flights.

23

24

25
    [1] All dollar amounts stated are in United States dollars unless otherwise specified.

1      38.    On October 20, 2004, Air New Zealand announced a fuel surcharge increase of

2  $14 on all flights from New Zealand to Los Angeles, San Francisco and Honolulu as well as on

3  flights from Pacific Island locations to Los Angeles. On November 1, 2004 EVA Air added a

4  fuel surcharge of $17 on air passenger tickets. On November 8, 2004, Singapore Air announced

5  that it would again increase prices for air passenger tickets for the second time in less than six

6  months due to increasing fuel prices, effective November 15, 2004.

7      39.    On February 1, 2005, ANA and JAL added a $24 fuel surcharge on passenger

8  flights between North America and Japan. On the same day, Singapore Air added a $32 fuel

9  surcharge on international air passenger tickets.

10      40.    On March 28 2005, Qantas increased its fuel surcharges on international

11  passenger flights to $35. On April 6, 2005, Air New Zealand announced an $8 increase in fuel

12  surcharges on long-haul passenger flights, effective April 12, 2005. On April 27, 2005,

13  Singapore Air announced that it would increase its fuel surcharges on air passenger tickets to $15

14  per sector for travel between Hong Kong and San Francisco and $22 per sector for all other

15  international flights effective May 1, 2005. That same day, Thai Air announced that it would

16  increase its fuel surcharges by $5, effective May 1, 2005, for all intercontinental flights.

17      41.    On July 1, 2005, ANA and JAL announced fuel surcharges on passenger air fares

18  between North America and Japan. On July 7, 2005, Singapore Air announced that it would

19  increase its fuel surcharges on passenger flights to the United States to $45, effective July 20,

20  2005.

21      42.    On August 1, 2005, Thai Air increased its fuel surcharges to $35 on international

22  passenger flights including those to and from the United States. On August 22, 2005, Air New

23  Zealand raised its fuel surcharges on international passenger flights to $92. Then next day

24  Qantas raised its surcharges to $75. That month Thai Air again increased these surcharges by

25  $15.

CLASS ACTION COMPLAINT

1    43.    On March 24, 2006, China Air and EVA Air announced that they would increase

2    their fuel surcharges from $32.50 to $39 for long-haul passenger flights effective April 6, 2006.

3    On April 21, 2006, Qantas raised its fuel surcharges to $65 on international passenger flights.

4    44.    On May 4, 2006, Air New Zealand announced that it would increase its fuel

5    surcharges on passenger flights from Australia to the U.S. (excluding Perth, Australia) by $11 to

6    $104 and Perth to the U.S. $16 to $138.  On May 15, 2006, China Air increased its fuel

7    surcharges to $70 on passenger flights between Taiwan and the U.S.  The next day, EVA Air

8    raised its fuel surcharges to $65 on flights between Singapore and the U.S.  On May 19, 2006,

9    Singapore Air increased its fuel surcharges to $90 on international passenger flights.  And on

10   June 1, 2006, Thai Air increased its fuel surcharged to $65 on passenger flights between

11   Bangkok and the U.S.

12   45.    On August 24, 2006, China Air increased its fuel surcharges on air passenger

13   flights to and from the U.S. to $90.  On August 31, 2006, Qantas raised its fuel surcharges to

14   $185 on international passenger flights.  On September 7 of that year, Singapore Air raised its

15   fuel surcharges on international flights to $90.

16   46.    On October 1, 2006, ANA and JAL raised their fuel surcharges to $113 on trans-

17   Pacific passenger flights.

18   47.    On January 1, 2007, ANA and JAL lowered their fuel surcharges on passenger

19   flights between Japan and North America to $108.  On February 1, 2007, Singapore Air

20   decreased its fuel surcharges on passenger flights between Singapore and the U.S. to $91.

21   48.    On May 1, 2007, ANA and JAL again lowered their fuel surcharges to $91 on

22   international passenger flights.

23   49.    Effective August 1, 2007, Cathay Pacific announced fuel surcharges of $54.40 on

24   passenger flights between Hong Kong and North America.  Effective August 10, 2007, EVA Air

25   announced $103 in fuel surcharges on passenger trans-Pacific flights to the U.S.

CLASS ACTION COMPLAINT

- 11 -

1        50.    On September 27, 2007, Cathay Pacific increased fuel surcharges HK\$424 to

2    HK\$428 for long distance passenger flights. On October 1, 2007, ANA and JAL raised their fuel

3    surcharges on passenger flights between Japan and the U.S.

4        51.    On November 7, 2007, Singapore Air began to charge \$104 in fuel surcharges on

5    passenger flights between Singapore and the U.S.

6        52.    Reports from trade association meetings support the existence of a conspiracy to

7    impose and increase these fuel surcharges. For example, on May 27, 2004, Giovanni Bisignani,

8    Director General and CEO of IATA stated:

9            On average, fuel accounts for 16% of airline operating costs. Fuel prices are
55% higher than one year ago. This could add between US\$8 and US\$12 billion
10   to our annual fuel bill and threatens to strangle our modest projected return to
profitability. Instead of flying high, we could be left swimming in red ink... The
11   current crisis resulting from sky high fuel prices once again highlights the
industry's vulnerability to external shocks... We need to build a new industry
12   structure capable of withstanding external shocks and delivering sustained
profitability.
13

14       53.    The next day, at an IATA Special Meeting in Geneva, the IATA board agreed to

15   recommend a three percent price increase for intercontinental flights from Europe and five

16   percent for those from other regions to cover rising fuel costs.

17       54.    In a June 3, 2004 press release, Giovanni Bisignani of IATA again raised the

18   same issue of high fuel prices:

19           While record high fuel prices challenge our profitability it is time to put our
efforts towards rebuilding the industry... It is appropriate that we meet in
20   Singapore at this critical time in our industry's history. Singapore is a leader of
the aviation industry. Singapore's liberal aviation policy and its industry leading
21   airline and airport provide an excellent backdrop for discussing our many
challenges. I am confident that this AGM, more than any other, will result in a
22   new direction for the industry.

23       55.    Between June 6 and 8, 2004, about 150 airlines executives attended IATA's

24   Annual General Meeting and World Air Transport Summit in Singapore. Rising fuel costs and

25   IATA's recommended fare increases were the talk of the meeting. Giovanni Bisignani of IATA

1  told attendees, "Last year we survived the four horsemen of the apocalypse: SARS, conflict in
2  Iraq, terrorism and the economy. But a fifth horseman, the price of oil, could add up to US$1
3  billion per month to our costs and deny us profitability yet again."

4  56.  A September 20, 2005 IATA press release acknowledged that fuel surcharges
5  were mitigating the impact of increased fuel costs: "Airlines are struggling to deal with a
6  ballooning fuel bill that is expected to reach US$97 billion – more than double the US$44 billion
7  in 2003. Efficiency gains, high load factors, and fuel surcharges are helping mitigate a portion of
8  the impact of the extraordinary price of fuel."

9  57.  In fact, IATA data demonstrate that the imposition of fuel surcharges was a
10  revenue generator for the airlines, not simply a cost recovery mechanism. The airlines' use of
11  fuel surcharges has allowed them to reach levels of profitability greater than when fuel prices
12  were much lower.

13  58.  For example, in October 18, 2007 remarks at the World Air Transport Forum,
14  Giovanni Bisignani of IATA stated, "The period since 2001 has been tough. To survive, airlines
15  have been tough in response. ... The results show in the bottom line: for the first time since
16  2000 airlines will turn a profit this year of US$5.6 billion."

17  59.  ANA reported a net profit of 7.68 billion *yen* for the first quarter of fiscal year
18  2006. Thai Air collected nearly $80 million in fuel surcharges and reported profits in the third
19  quarter of 2006. An August 10, 2006 article in *The China Post* quoted a securities analyst as
20  saying that "' [t]he higher fuel surcharge in place was also quite effective'" in raising Thai Air's
21  revenues. Similarly, on August 28, 2007, Air New Zealand announced a net profit of NZ$214
22  million, up 123% from the previous year. For the same period, Air New Zealand's operating
23  costs increased by 13% while the number of passengers increased only by 4.9%.

24  60.  A recent position paper from the Centre for Asia Pacific Aviation, a provider of
25  aviation intelligence, supports the conclusion that defendants were engaged in a conspiracy to fix

1  prices. The paper states, "Higher fuel prices drove the flag carriers away from the mindless

2  chase after market share into a more considered quest for profitability."

3      61.    As the following aggregate industry data reported by the IATA in September

4  2007 demonstrates, the airline industry's operating profits were already declining before there

5  was any substantial rise in fuel costs. These data also show that the airlines' fuel surcharges,

6  which were implemented in 2004, were not a true cost recovery mechanism, but rather a

7  camouflaged revenue generator. Consequently, the airlines' use of fuel surcharges has allowed

8  them to reach levels of profitability greater than when fuel prices were stable.

|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007f | 2008f |
|---|---|---|---|---|---|---|---|---|---|
| Passenger Revenues in Billions | $256 | $239 | $238 | $249 | $297 | $323 | $355 | $389 | $416 |
| Expenses in Billions | $318 | $319 | $311 | $323 | $376 | $409 | $440 | $473 | $500 |
| Crude Oil Price, Brent, $/barrel | $28.8 | $24.7 | $25.1 | $28.8 | $38.3 | $54.5 | $65.1 | $67.0 | $66.0 |
| Operating Profits in Billions | $1.1 | -$4.2 | -$3.7 | -$2.3 | -$1.5 | -$1.0 | -$0.1 | $1.1 | $1.5 |

    62.    The fact that defendants' fuel surcharges are revenue generators rather than a cost

recovery mechanism is further evidenced by the record profits that defendants have experienced

since implementing the surcharges.

    63.    ANA reported net income of 26.722 billion *yen* for the fiscal year 2006.

    64.    Thai Air reported third quarter 2007 net income of $260,397,326 (8.327 billion

*Baht*) and fuel surcharge proceeds of $127,152,046 (4.066 billion *Baht*). In the year previous, an

August 10, 2006 article in *The China Post* quoted a securities analyst as saying that "[t]he higher

fuel surcharge in place was also quite effective" in raising Thai Air's revenues.

    65.    In the 12 months ending June 30, 2007, Qantas saw a 49.9 percent increase in net

profit. The *Sydney Morning Herald* reported that each AU$1 of Qantas' fuel surcharge on

- 14 -

1   international flights translated to AU$10 million in annual revenue. For the half-year ended
2   December 31, 2007, Qantas reported net income of $518,813,430.13 (AU $618 million).

3   66.   On August 7, 2007, *The Japan Times* reported that JAL's operating loss shrank
4   from 31.9 billion *yen* the prior year to 8.5 billion *yen*. The article further stated, "Yoshimasa
5   Kanayama, [JAL] executive officer, *attributed the improved earnings performance to* the
6   carrier's efforts to cut costs, brisk business demand for international flights, higher revenue per
7   passenger achieved through fare hikes on domestic routes and *increased fuel surcharges in*
8   *international flights*." [Emphasis added.]

9   67.   On August 8, 2007, Cathay Pacific announced that its passenger revenue had
10   increased 14.6% for the first half of the year, compared with same period in the previous year.
11   The total number of passengers increased by only 4.1%, but passenger yield was up 14.6%.

12   68.   On August 28, 2007, Air New Zealand announced that its net profit after tax was
13   NZ$214 million, up 123 percent from the previous year. Notably, operating revenue increased
14   13 percent, while the number of passengers carried only increased 4.9 percent.

15   69.   IATA has reported that whereas in 2002, airlines needed an oil price of less than
16   $20 a barrel to break even, in 2007, they are profitable with oil prices at nearly $70 a barrel.

17   70.   A January 2007 article in *Air Transport World* reported that "airlines are surfing a
18   wave of earnings momentum" and forecasted that "2007 may well be the peak year in the current
19   airline earnings cycle."

20   71.   The following fares and surcharges published in November 2007 at
21   *www.flightstats.com* show that defendants' collusive pricing is continuing:

22   **San Francisco to Auckland**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| Air New Zealand | Coach | $918 | $255 | $1173 |
| Qantas | Coach | $918 | $255 | $1173 |

**San Francisco to Bangkok**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| All Nippon | Coach | $650 | $281 | $931 |
| Japan Air | Coach | $620 | $281 | $901 |

**San Francisco to Hong Kong**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| All Nippon | Coach | $580 | $269 | $849 |
| Japan Air | Coach | $579 | $269 | $848 |

**San Francisco to Sydney**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| All Nippon | Coach | $818 | $312 | $1130 |
| Japan Air | Coach | $818 | $308 | $1126 |

| Air New Zealand[2] | Coach | $718 | $312 | $1030 |
|---------|-------|-----------|------------|-------|
| Qantas | Coach | $718 | $308 | $1026 |

---

[2] Data for Flights from San Francisco to Sydney on New Zealand Air and Qantas were published on *www.flightstats.com* in March 2008.

**San Francisco to Taipei**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| EVA Air | Coach | $719 | $274 | $993 |
| Japan Air | Coach | $620 | $274 | $894 |
| Qantas | Coach | $1575 | $274 | $1849 |
| Singapore Air | Coach | $900 | $274 | $1174 |
| Thai Air | Coach | $1660 | $274 | $1934 |

**San Francisco to Tokyo**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| All Nippon | Coach | $529 | $270 | $799 |
| Japan Air | Coach | $529 | $270 | $799 |

**D.    Investigations by Competition Authorities**

72.    In or around February of 2006, news sources reported that the DOJ, European Union ("EU") and regulators in Asia were investigating possible price-fixing in the air cargo industry. The U.S. and European Commission ("EC") searched and contacted the offices of dozens of airlines around the world in connection with their investigations.  In or around June of 2006, the investigations were reported to have expanded into possible price-fixing of passenger airfares and fuel surcharges. These investigations have resulted thus far in three guilty pleas and fines assessed in the U.S. and Britain against British Air, Korean Air and Qantas.

73.    Following report of investigations into price-fixing of charges for air cargo, numerous lawsuits were filed on behalf of purchasers of air cargo shipping services against all major airlines involved in air cargo shipping, including almost all defendants named in this complaint. Twenty-three of the complaints were ordered consolidated on June 20, 2006 in the

1    Eastern District of New York, *In re Air Cargo Shipping Services Antitrust Litigation*, MDL 06-
2    1775. Thus far, Lufthansa, an amnesty applicant in the British and U.S. regulatory
3    investigations, is the only defendant who has settled with the plaintiffs (pending a fairness
4    hearing). Lufthansa AG was conditionally accepted after disclosing its participation in the
5    international air cargo conspiracy in which both British Air and Korean Air also were
6    participants.

7         74.    On August 1, 2007, the DOJ and the British Office of Fair Trading ("OFT")
8    announced that British Air, which was a shareholder in Qantas when Qantas first implemented
9    fuel surcharges, pleaded guilty to charges of price-fixing in both its air cargo and air passenger
10   operations, and agreed to pay fines of £121.5 million ($246 million) in Britain and $300 million
11   in the U.S. The plea agreements detailed British Air's participation in a conspiracy to fix prices
12   of fuel surcharges on air cargo shipments and passenger long-haul international flights.

13        75.    On August 1, 2007, along with announcement of the plea and fine of British Air,
14   the DOJ filed a criminal information against Korean Air in the United States District Court for
15   the District of Columbia, charging it with violating Section 1 of the Sherman Act for conspiring
16   with an unnamed rival airline in two conspiracies: to fix air cargo rates, and to fix prices of
17   components of passenger airfares and certain wholesale fares, on flights from the United States
18   to Korea. That same day, the DOJ announced that Korean Air had agreed to plead guilty and pay
19   a $300 million fine for its participation in the two charged conspiracies.

20        76.    Civil suits were also filed in connection with the investigations into price-fixing
21   of air passenger fares and fuel surcharges. In or around June of 2006, suits filed in the U.S. by
22   passengers on British Air flights originating in Britain and the United States alleging that British
23   Air and Virgin Atlantic conspired to fix prices of passenger airfares including fuel surcharges,
24   were consolidated in the U.S. District Court for the Northern District of California. British Air
25   and Virgin Atlantic have settled with the two classes of plaintiffs, the U.S. purchasers receiving

1  $59 million and the British purchasers receiving £73.5 million or $144.7 million. British Air's
2  long-haul international flights from Britain and the U.S. fly to numerous destinations around the
3  world, including Hong Kong and other Asia-Pacific destinations in Australia, China, Indonesia,
4  Japan, Malaysia, New Zealand, Singapore, South Korea, Thailand and Vietnam. Virgin Air
5  flights from Britain and the U.S. travel to numerous world-wide destinations including Hong
6  Kong, Shanghai, Singapore, Sydney and Tokyo.

7      77.    U.S. civil suits alleging a price-fixing conspiracy between Korean Air, Asiana and
8  unnamed co-conspirators related to price-fixing of passenger fares and fuel surcharges on flights
9  between the U.S. and Korea have been consolidated in the Central District of California, MDL
10  No. 1891 (Master File No. CV 07-05107 SJO (AGRx)).

11      78.    In March of 2007, the FBI raided the Los Angeles office of ANA in connection
12  with the DOJ investigation of price-fixing of air cargo shipments and European regulators raided
13  offices of airlines in Europe, including KLM Dutch Airlines.

14      79.    On November 27, 2007, Qantas pleaded guilty to charges of conspiring with
15  unnamed co-conspirators to fix rates for air cargo shipments, and agreed to pay $61 million in
16  fines. Qantas has agreed to cooperate with the DOJ's "ongoing investigation."

17      80.    In December 2007, the EU reported that it had charged several airlines with an
18  alleged air-cargo cartel. British Air, SAS and JAL confirmed they had received the formal
19  charges and would study them. The EC also reportedly served Statements of Objection
20  regarding its air cargo price-fixing investigation on Air New Zealand, ANA, Cathay Pacific,
21  Singapore Air and Thai Air, with responses due this month.

22      81.    Recent reports state that the EU has begun an antitrust probe into possible price-
23  fixing by international airlines flying between EU countries and Japan. German carrier
24  Lufthansa, KLM Royal Dutch Airlines, a unit of Air France-KLM, have confirmed that their
25

CLASS ACTION COMPLAINT

1   offices in Frankfurt and Amsterdam were raided. A spokesman for an EU Competition

2   Commissioner stated that the investigation would not be limited to European airlines.

3       82.     On or about March 12, 2008, three months after Qantas' guilty plea regarding

4   price-fixing on air cargo shipments, the DOJ has summoned several senior Qantas freight

5   managers to San Francisco to appear at an investigation into illegal price-fixing between

6   international airlines. As reported, the Qantas interviews come as international regulators

7   continue to investigate one of the biggest cartel-breaking operations in history. Court documents

8   stemming from a court battle between the Australian Competition and Consumer Commission

9   ("ACCC") and Korean Air – which has refused to hand over documents- revealed that the ACCC

10  investigations are in their final stages and that the ACCC is poised to act, 19 months after

11  launching its own inquiry.

12      83.     The admissions of culpability by certain airlines and the widespread and

13  concerted investigations of regulatory authorities demonstrate that the structure of the

14  international airline industry is conducive to anticompetitive conduct and that the conspiracy

15  alleged is plausible.

16  ## FRAUDULENT CONCEALMENT

17      84.     Throughout the Class Period, defendants affirmatively and fraudulently concealed

18  their unlawful conduct against plaintiff and the Class.

19      85.     Plaintiff and the members of the Class did not discover, and could not have

20  discovered through the exercise of reasonable diligence, that defendants were violating the

21  antitrust laws as alleged in this complaint until August 3, 2007, when it was reported that Qantas

22  was involved in the investigation by competition authorities into price-fixing of passenger and

23  cargo flights.

24      86.     Plaintiff could not have discovered the existence of the combination and

25  conspiracy alleged at an earlier date by the exercise of reasonable due diligence because of the

CLASS ACTION COMPLAINT

- 20 -

1  deceptive practices and techniques of secrecy employed by the defendants and their co-

2  conspirators to avoid detection and affirmatively conceal such violations, including without

3  limitation, falsely attributing price increases to increased operating costs. The conspiracy by its

4  nature was self-concealing.

5      87.    Plaintiff had no reason to disbelieve defendants' statements which on their face

6  appeared to be reasonable explanations for the pricing of Transpacific Air Services.

7  Furthermore, most of the explanations provided by defendants involved non-public and/or

8  proprietary information completely in defendants' control such that plaintiff and members of the

9  Class could not verify their accuracy. Defendants' purported reasons for the price increases of

10 Transpacific Air Services were materially false and misleading and were made for the purpose of

11 concealing defendants' anti-competitive scheme as alleged. In truth, at all relevant times, the

12 price of Transpacific Air Services was artificially inflated and maintained as a direct result of the

13 defendants' anti-competitive scheme, the operation of which was a substantial, but undisclosed,

14 factor in the pricing of Transpacific Air Services during the Class Period.

15     88.    Defendants further affirmatively concealed their conspiracy by agreeing among

16 themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and

17 communications in furtherance of their illegal scheme and by engaging in secret meetings,

18 telephone calls, and other communications in order to further their illicit cartel.

19     89.    As a result of defendants' fraudulent concealment of their conspiracy, plaintiff

20 and the members of the Class assert the tolling of any applicable statutes of limitations affecting

21 the rights of action of Plaintiff and the members of the Class.

22                            **CLASS ACTION ALLEGATIONS**

23     90.    Plaintiff brings this action on behalf of himself individually, and as a class action

24 pursuant to Federal Rules of Procedure, Rule 23(a) and (b) on behalf of the following class (the

25 "Class"):

All persons and entities that purchased passenger air transportation services that included at least one transpacific flight segment to or from the United States (other than between the United States and Korea) from one or more defendant(s) between January 1, 2004 and the present. The Class does not include: (1) defendants; (2) defendants' parents, subsidiaries, of affiliates; (3) any governmental entities; (4) any co-conspirators; or (5) any judicial officer to whom this case is assigned.

91.     Plaintiff does not know the exact number of Class members because such information is in the exclusive control of defendants. Plaintiff believes that, due to the nature of the trade and commerce involved, there are most likely hundreds of thousands, if not millions, of Class members in the United States and the world such that joinder of all Class members is impracticable.

92.     Plaintiff's claims are typical of the claims of the Class in that plaintiff purchased Transpacific Air Services from one or more defendants, all Class members were damaged by the same wrongful conduct, and the relief sought is common to the Class.

93.     Numerous questions of law or fact arise from defendants' anti-competitive conduct that are common to the Class. These common questions include:

a.     whether defendants engaged in a contract, combination or conspiracy with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for Transpacific Air Services;

b.     whether the purpose and/or effect of the acts and omissions alleged was to restrain trade, or to affect, fix, control, and/or maintain the prices for Transpacific Air Services;

c.     the existence and duration of the horizontal agreements alleged to fix, raise, maintain, and/or stabilize the prices for Transpacific Air Services;

d.     whether defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

1    e.    whether defendants fraudulently concealed their conspiracy so as to

2          equitably toll any applicable statutes of limitations;

3    f.    whether defendants' agents, officers, employees, or representatives

4          participated in correspondence and meetings in furtherance of the illegal

5          conspiracy alleged in this complaint and if so, whether such agents,

6          officers, employees or representatives were acting within the scope of

7          their authority and in furtherance of defendants' business interests;

8    g.    whether, and to what extent, the conduct of defendants caused injury to

9

10         plaintiff and members of the Class, and if so, the appropriate measure of

11         damages; and

12   h.    whether plaintiff and members of the Class are entitled to injunctive relief

13         to prevent he continuance or furtherance of the violation of Section 1 of

14         the Sherman Act alleged.

15   94.   These questions of law or fact are common to the Class and predominate over any

16   other questions affecting only individual Class members.

17   95.   Plaintiff will fairly and adequately represent the interests of the Class in that he is

18   a typical purchaser of Transpacific Air Services from defendants and his claims are coincident

19   and not in conflict with the claims of any other member of the Class.

20   96.   Plaintiff is represented by counsel competent and experienced in the prosecution

21   of antitrust and class action litigation.

22   97.   A class action is superior to the alternatives, if any, for the fair and efficient

23   adjudication of this controversy because:

24

25

a.   The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

b.   The Class is readily definable and one for which records should exist in the files of defendants.

c.   Prosecution as a class action will eliminate the possibility of repetitious litigation.

d.   Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

e.   Class action treatment will permit the adjudications of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

### COUNT I

**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

98.   Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth.

99.   Although the exact start date of the conspiracy is unknown to plaintiff, he believes that beginning on or about January 1, 2004, defendants, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

1    100.    Defendants and their co-conspirators agreed to and did restrain trade or commerce

2  by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive levels, the

3  prices of Transpacific Air Services.

4    101.    Upon information and belief, for the purpose of formulating and effectuating their

5  contract, combination or conspiracy, defendants and their co-conspirators did those things they

6  contracted, combined or conspired to do, including:

7        a.    participating in meetings, conversations, and communications to discuss

8            the prices of Transpacific Air Services;

9        b.    agreeing to the prices that would be charged for Transpacific Air Services;

10        c.    issuing price announcements and price quotations in accordance with the

11            agreements reached;

12        d.    charging plaintiff and the members of the Class for Transpacific Air

13            Services at agreed-upon levels; and

14        d.    engaging in meetings, conversations, and communications for the purpose

15            of monitoring, enforcing and adhering to the agreed-upon prices.

16

17    102.    As a direct result of the unlawful conduct of defendants and their co-conspirators

18  in furtherance of their continuing contract, combination or conspiracy, plaintiff and the other

19  members of the Class have been injured in their business and property in that they have paid

20  more for Transpacific Air Services than they would have paid in the absence of defendants' price

21  fixing.

22                                **EFFECTS**

23    103.    The above combination and conspiracy has had the following effects, among

24  others:

25

a.  price competition in the sale of Transpacific Air Services by defendants
    and their co-conspirators has been restrained, suppressed, and eliminated
    throughout the United States;

b.  prices for Transpacific Air Services sold by defendants have been raised,
    fixed, maintained and stabilized at artificially high and non-competitive
    levels throughout the United States and the areas of the world defendants
    serve on transpacific flights; and

c.  purchasers of Transpacific Air Services from defendants have been
    deprived of the benefit of free and open competition in the purchase of
    such services; and

d.  competition in the sale of Transpacific Air Services has been restrained,
    suppressed or eliminated.

104.  As a direct and proximate result of the unlawful conduct of defendants, plaintiff
and the other members of the Class have been injured in their business and property in that they
paid more for Transpacific Air Services than they otherwise would have paid in a competitive
marketplace absent the unlawful conduct of defendants.

## DAMAGES

105.  During the Class Period, plaintiff and the other members of the Class purchased
Transpacific Air Services directly from defendants or their subsidiaries, agents, and/or affiliates,
and as a direct and proximate result of the antitrust violations alleged, paid more for such
services than they would have paid in the absence of such antitrust violations. As a result,
plaintiff and the other members of the Class have sustained damages to their business and
property in an amount to be determined at trial.

1

**PRAYER FOR RELIEF**

2    WHEREFORE, plaintiff prays as follows:

3         A.     that the Court determine that this action may be maintained as a class action under

4    Federal Rule of Civil Procedure 23(b)(3) on behalf of the Class defined, and issue an order

5    directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure

6    23(c)(2), be given to each member of the Class;

7         B.     that the Court adjudge and decree that the unlawful combination and conspiracy

8    alleged is an unreasonable restraint of trade and commerce in violation of Section 1 of the

9    Sherman Act (15 U.S.C. §1);

10        C.     that the Court enter judgment against defendants, jointly and severally, in favor of

11   plaintiff and the Class;

12        D.     that the Court award plaintiff and the Class treble damages;

13        E.     that the Court award plaintiff and the Class attorneys' fees and costs as well as

14   pre-judgment and post-judgment interest as permitted by law;

15        F.     that defendants and their co-conspirators, their respective successors, assigns,

16   parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and

17   employees and all other persons acting or claiming to act on behalf of defendants or their co-

18   conspirators, or in concert with them, be permanently enjoined and restrained from, in any

19   manner, directly or indirectly, continuing, maintaining or renewing the combination , conspiracy,

20   agreement, understanding or concert of action, or adopting any practice, plan, program or design

21   having a similar purpose or effect in restraining competition; and

22        G.     that the Court award plaintiff and the Class such other and further relief as it may

23   deem necessary and appropriate.

24

25

CLASS ACTION COMPLAINT

- 27 -

1

## JURY DEMAND

2        Plaintiff demands a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), of all

3 triable issues.

4 DATED: March 14, 2008

5                                       Susan G. Kupfer

6                                  Susan G. Kupfer (Bar No. 141724)
                                 Kathleen S. Rogers (Bar No. 122853)
                                 GLANCY BINKOW & GOLDBERG LLP

7                                  One Embarcadero Center, Suite 760
                                 San Francisco, CA 94111

8                                  Telephone: (415) 972-8160
                                 Facsimile:  (415) 972-8166

9                                  skupfer@glancylaw.com
                                 krogers@glancylaw.com

10

11                                  *Attorneys for Plaintiff and the Proposed Class*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JS 44 - CAND (Rev. 11/04)

# E-filing   CIVIL COVER SHEET

MEJ 10

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO.)

## I.(a) PLAINTIFFS

RUFUS BROWNING, Individually and On Behalf of All Other Similarly Situated,

**DEFENDANTS**

AIR NEW ZEALAND, LTD. et al

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

ALAMEDA COUNTY, CALIFORNIA

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Susan Kupfer, Glancy Binkow & Goldberg LLP, One Embarcadero Center Suite 760, San Francisco, CA, 94111. Tel: (415) 972-8160

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN 'X' IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF
(For diversity cases only)   AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

☒ Original Proceeding
☐ Removed from State Court
☐ Remanded from Appellate Court
☐ Reinstated or Reopened
☐ Transferred from Another district (specify)
☐ Multidistrict Litigation
☐ Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 161 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 382 Personal Injury Med Malpractice<br>☐ 385 Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☒ 400 State Reapportionment<br>☒ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 USC 3410 |
| | | | **LABOR** | **SOCIAL SECURITY** | ☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act |
| | | | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt Relations<br>☐ 730 Labor/Mgmt Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl.Ret. Inc. Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 Amer w/ disab - Empl<br>☐ 446 Amer w/ disab - Other<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV | ☐ 510 Motion to Vacate Sentence Habeas Corpus:<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | | ☐ 870 Taxes (US Plaintiff or Defendant<br>☐ 871 IRS - Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions |

## VI. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Sections 4, 12 and 16 of the Clayton Act (15 U.S.C. §§15, 22 and 26) and Section 1 of the Sherman Antitrust Act (15 U.S.C. §1)

## VII. REQUESTED IN COMPLAINT: ☒ CHECK IF THIS IS A CLASS ACTION   DEMAND $_____ ☐ CHECK YES only if demanded in complaint:
UNDER F.R.C.P. 23   JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY
PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".   CHARLES BREYER
ND CA Case No. M:08-CV-1913-CRB

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)   ☒ SAN FRANCISCO/OAKLAND   ☐ SAN JOSE

DATE   SIGNATURE OF ATTORNEY OF RECORD

March 14, 2008   Susan G. Kupfer

Court Name: U.S. District Court, NDCA
Division: 3
Receipt Number: 34611017005
Cashier ID: bucklem
Transaction Date: 03/14/2008
Payer Name: larry r morris
------------------------------------
CIVIL FILING FEE
 For: rufus browning
 Case/Party: D-CAN-3-08-CV-001458-001
 Amount:      $350.00
------------------------------------
CHECK
 Check/Money Order Num: 2152
 Amt Tendered: $350.00
------------------------------------
Total Due:       $350.00
Total Tendered: $350.00
Change Amt:      $0.00

mej


Checks and drafts are accepted
   subject to collections and full
   credit will only be given when the
   check or draft has been accepted by
   the financial institution on which
   it was drawn.